**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** : | |
| : | **MISC. NO.** |
| v. : | |
| : | **Filed Under Seal** |
| **HERBERT BAYLOR** : | |
| : | |
| **Defendant.** : | |

**AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT AND ARREST WARRANTS**

**I.    IDENTITY OF THE AFFIANT**

I, Garrett S. Churchill, being duly sworn, state:

1.    I am a Special Agent with the Federal Bureau of Investigation ("FBI") assigned to the Washington Field Office. I have been in this position since May 2019. I am currently assigned to investigate public corruption, government fraud, and civil rights matters in the District of Columbia. My primary responsibilities include conducting and assisting with investigations involving public corruption, fraud, and other related violations of federal criminal law. Based upon my experience and training with the FBI, I am familiar with the methods used to introduce prohibited objects, as defined by 18 U.S.C. §1791 (Providing or Possessing Contraband in Prison), into prisons and the trafficking patterns of narcotics operations. I am also familiar with methods used to obtain and distribute controlled substances, as defined by 21 U.S.C. § 841 (Possession with Intent to Distribute). During my training at the FBI Academy in Quantico, Virginia, I have received training in a variety of investigative and legal matters, including physical surveillance, legal statutes and procedures, financial investigations, confidential source management, Fourth Amendment searches, the drafting of search warrant affidavits, probable cause, and digital forensic data analysis. As a federal agent, I am authorized to investigate violations of laws of the United

States, and as a law enforcement officer I am authorized to execute warrants issued under the authority of the United States.

2. I am assigned to this investigation and my involvement has included, but is not limited to, interviewing witnesses and reviewing documentary evidence.

## II. REASON FOR AFFIDAVIT

3. This affidavit is made in support of a criminal complaint and arrest warrant charging HERBERT BAYLOR ("BAYLOR") with violations of 18 U.S.C. § 371 (Conspiracy), 18 U.S.C. § 201(b)(2) (Bribery), and 18 U.S.C. 1791(a)(1) (Providing Contraband in Prison). In particular, and as described more fully below, there is probable cause to believe that BAYLOR and District of Columbia ("DC") Department of Corrections ("DOC") Correctional Treatment Facility ("CTF") inmate Co-Conspirator-1 conspired to smuggle prohibited objects and other contraband into CTF, a DOC correctional facility, for the benefit of Co-Conspirator-1 and in return for payments to BAYLOR.

4. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, witnesses, and agencies. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant. It does not set forth all of my knowledge, or the knowledge of others, about this matter.

## III. PROBABLE CAUSE

*Background*

5. The CTF is a correctional institution operated by the DOC. CTF is located adjacent to its sister facility, the Central Detention Facility (CDF), a second correctional institution operated by the DOC. CDF is used to house adult male detainees awaiting trial, serving a misdemeanor sentence, or in transit to a Bureau of Prisons facility. CTF is a specialized medium security penal

institution that houses inmates requiring specialized medical treatment or treatment/monitoring related to substance dependencies. This includes federal detainees awaiting trial, pursuant to a contract with the Bureau of Prisons. The address of CTF is located at 1901 E Street SE, Washington, District of Columbia ("DC").

6. BAYLOR is a DOC case manager employed by DOC to assist and manage inmates housed at CTF, to include Co-Conspirator-1. BAYLOR has an office at CTF located on the D1A men's housing unit that contains, among other things, a computer and office phone provided by DOC, BAYLOR's employer, to BAYLOR for BAYLOR's use in carrying out his assigned duties. BAYLOR's duties and responsibilities include helping with the administrative pre-trial and trial needs of inmates, including logistics for contacting the attorneys and/or social workers of said inmates. As a DOC employee, he is governed by the October 21, 2022 DOC Contraband Control party, which indicates that trafficking contraband of any kind to inmates is strictly prohibited.

7. Co-Conspirator-1 has been detained at DOC since approximately July 2022 when he was arrested and jailed on DC Superior Court charges related to kidnapping and first-degree sexual abuse violations of the DC Code. Co-Conspirator-1 had been housed at CTF in the D1A housing unit from approximately February 2023 until June 26, 2024, when Co-Conspirator-1 was transferred to CDF from CTF for disciplinary reasons due to the discovery of a contraband cellular phone. On August 9, 2024, Co-Conspirator-1 was sentenced to life in prison related to the aforesaid kidnapping and sexual assault violations. On August 28, 2024, Co-Conspirator-1 was transferred back to the CTF D1A housing unit from CDF and has been detained there since.

8. In July 2024, investigators received information regarding a contraband smuggling ring, involving BAYLOR and Co-Conspirator-1. Specifically, Co-Conspirator-1 would direct Co-Conspirator-2—a close confidant of Co-Conspirator-1—over the phone to discretely fit

contraband into a cigarette carton. Co-Conspirator-2 would then give the cigarette carton containing contraband to BAYLOR to smuggle into the CTF. BAYLOR would then smuggle the contraband into the CTF and deliver it to Co-Conspirator-1 in exchange for payment, using either cash or a peer-to-peer payment application such as CashApp. This information was corroborated by records received from telecommunications companies and Block, Inc.—the owner of CashApp.

9. According to records received from AT&T, the subscriber of phone number ending in -6183 is Co-Conspirator-2. DOC OIS investigators conducted internal database checks and informed the FBI that BAYLOR's DOC office land-line phone number ending in -6746 ("BAYLOR'S OFFICE PHONE"). BAYLOR was the only DOC employee assigned to the office in which the aforesaid land-line office phone was located.

10. Records received from AT&T and Lumen Technologies confirmed that Co-Conspirator-2 and BAYLOR'S OFFICE PHONE, respectively, had placed incoming and outgoing calls to each other approximately 106 times from September 1, 2023, to July 18, 2024, with the first call taking place on January 5, 2024 (incoming call from Co-Conspirator-2 to BAYLOR'S OFFICE PHONE) and the last observed call during the available time period taking place on June 21, 2024. FBI investigators understood the frequency and timing of the calls between Co-Conspirator-2 and BAYLOR'S OFFICE PHONE to corroborate the information provided about Co-Conspirator-1's scheme to use BAYLOR's office phone to direct Co-Conspirator-2 on smuggling contraband into the prison as described in the preceding paragraphs.

11. Records from T-Mobile confirmed that the subscriber of cellular phone number ending in -3045 is BAYLOR ("BAYLOR'S CELL PHONE"). Toll records also revealed that BAYLOR'S CELL PHONE and Co-Conspirator-2 had incoming calls, outgoing calls, and text messages to each other approximately twenty (20) times from January 16, 2024, to June 18, 2024.

12. Block, Inc. provided information on Co-Conspirator-2's CashApp account. Co-Conspirator-2's CashApp account revealed at least seven (7) payments to BAYLOR, totaling approximately $2,251 and ranging from approximately $50 to $300 per payment, between the date ranges of approximately February 3, 2024 (first observed CashApp payment) to June 21, 2024 (last observed CashApp payment during available period of information).

13. Based on law enforcement knowledge and experience from previous prison smuggling investigations, FBI investigators understand that inmates involved in distributing contraband will task third-party associates, that are not incarcerated, to use CashApp, or other money-transfer or peer-to-peer payment services or applications, as a method of keeping and exchanging money for the distributing inmate. The purpose of such transactions is to (a) collect payments from the associates of other incarcerated inmates to whom contraband is sold by the distributing inmate; and (b) make payments to un-incarcerated facilitator(s) (such as complicit DOC employees) involved in introducing the contraband to the distributing inmate.

14. Review of Co-Conspirator-2's CashApp accounts also revealed that Co-Conspirator-2 received payments in round denominations (e.g., $200) containing in the subject line the street names or nicknames of inmates (e.g., for Eli) incarcerated at DOC facilities from various third parties, who are believed to be outside facilitators of the associated inmates. These payments appear to represent the collection of payments from incarcerated inmates receiving contraband from Co-Conspirator-1 to Co-Conspirator-2 on behalf of Co-Conspirator-1. At least one payment was located in which Co-Conspirator-2 received a Cash App payment of $100 with the subject "for Rock from YB", believed to be the street name or nickname of an inmate sending money to Co-Conspirator-2 on behalf of Co-Conspirator-1.[1]

---

[1] "Rock" is Co-Conspirator-1's known nickname.

15.     FBI investigators conducted an analysis of CashApp payments to BAYLOR from Co-Conspirator-2's CashApp compared to calls to or from Co-Conspirator-2 placed on BAYLOR'S OFFICE PHONE. Of the seven total payments observed from Co-Conspirator-2 to BAYLOR, the following observations were made: (a) for all seven payments, completed calls were observed between BAYLOR and Co-Conspirator-2 on one or more of the following: the same day, the day before, and/or the day after a payment was made; (b) for five of the payments, calls between BAYLOR and Co-Conspirator-2 were observed on the same day a payment was made. On February 7, 2024, a call from BAYLOR to Co-Conspirator-2 was observed. Approximately forty-five minutes later, a $200 payment was made via CashApp from an account registered to Co-Conspirator-2 to a CashApp account registered to BAYLOR. On June 5, 2024, a call from BAYLOR to Co-Conspirator-2 was observed. Approximately two minutes later, a $200 payment was made via CashApp from Co-Conspirator-2's account to BAYLOR's account. On June 10, 2024, a call from BAYLOR to Co-Conspirator-2 was observed. Approximately two hours and fifteen minutes later, a $150 payment was made via CashApp from Co-Conspirator-2's account to BAYLOR's account, followed by $50 sent the following day (June 11, 2024) from Co-Conspirator-2 account to BAYLOR's account. On June 21, 2024, a call from BAYLOR to Co-Conspirator-2 was observed. Approximately twenty minutes later, a $300 payment was made via CashApp from Co-Conspirator-2's account to BAYLOR's account.

*Undercover Activity to Investigate Narcotics Distribution*

16.     On or about August 16, 2024, a former FBI undercover employee ("Informant-1") contacted Co-Conspirator-1 via telephone at the direction of FBI investigators. Co-Conspirator-1 believed that Informant-1 was a major narcotics distributor based out of Detroit that could supply Co-Conspirator-1 with narcotics. Co-Conspirator-1 and Informant-1 developed a friendly

relationship and had several phone calls since on or around August 2024 to the present day of the submission of this affidavit. These phone calls were consensually monitored and recorded by Informant-1.

17.     On or around August 7, 2024, Co-Conspirator-1 met with Individual-1 via a jail video call.[2] FBI investigators later determined that Individual-1 was Co-Conspirator-2's son. Co-Conspirator-1 informed Individual-1 that he wanted to introduce Individual-1 to "someone else." FBI investigators understood that Co-Conspirator-1 was referring to Informant-1 after Co-Conspirator-1 revealed more background information to Individual-1 as to how Co-Conspirator-1 would obtain the phone number of the "someone else."

18.     On or around August 18, 2024, Co-Conspirator-1 contacted Informant-1 via a recorded jail call using DOC's jail phone.[3] Co-Conspirator-1 informed Informant-1 that he wanted to introduce Informant-1 to his "stepson."

19.     On or around August 18, 2024, Informant-1 contacted Individual-1. Informant-1 told Individual-1 that Co-Conspirator-1 informed him to call Individual-1. Individual-1 and Informant-1 agreed to meet in Washington, DC during Informant-1's next visit. This phone call was consensually monitored and recorded by Informant-1.

20.     On or around August 30, 2024, Informant-1 and Individual-1 met at a restaurant located in Washington, DC. The meeting was consensually monitored and recorded by Informant-1. Individual-1 stated that he would like to sell marijuana and Percocet and that he would like Informant-1 to obtain those drugs for him and supply them to Individual-1. Informant-1 inquired

---

[2] By DOC policy, all inmates are informed that jail calls and video jail calls are monitored and recorded.

[3] In addition to the recordings of the jail calls by DOC, Informant-1 consensually recorded his calls with Co-Conspirator-1.

if Co-Conspirator-1 had someone at the jail that helped him smuggle in narcotics. The conversation was as follows:[4]

> **Informant-1:** *Do you know does he have somebody that we can go to get him something in…does he have a good…someone he trusts?*
>
> **Individual-1:** *[unintelligible]…my momma can get it in.*
>
> **Informant-1:** *Oh okay, okay. Is she working there? Is she…*
>
> **Individual-1:** *[unintelligible] Nah, she give it to somebody…I think his counselor.*
>
> **Informant-1:** *Oh counselor.*
>
> **Individual-1:** *[unintelligible]…8 ball, weed, all that [expletive].*
>
> **Informant-1:** *Okay.*

21. On or around September 3, 2024, Informant-1 and Co-Conspirator-1 spoke telephonically. The call was consensually monitored and recorded by Informant-1. Co-Conspirator-1 used phone number BAYLOR'S OFFICE PHONE. Co-Conspirator-1 informed Informant-1 that "we can talk now, ain't got to worry about [expletive] now" and that he was in "office right now called from [his] counselor's phone." Informant-1 and Co-Conspirator-1 discussed Informant-1's meeting with Individual-1. Informant-1 described to Co-Conspirator-1 the price Informant-1 would charge Individual-1 for a wholesale supply of marijuana and Percocet that Individual-1 wanted to distribute. Co-Conspirator-1 described the "markup" and "DC prices" of re-selling narcotics; Co-Conspirator-1 explained he would get a portion of the profits and Individual-1 would get a portion of the profits. Co-Conspirator-1 described that he trusted Co-Conspirator-2 to assist him with obtaining narcotics then giving them to her son, Individual-1, for

---

[4] Informant-1 consensually recorded the in-person meeting with Individual-1 surreptitiously. The following transcription of the recording was made to the best of the Affiant's ability to accurately capture the contents of the conversation verbatim, however, there may be de minimis variations in the actual statements made due to audio quality.

distribution. Co-Conspirator-1 requested suboxone strips from Informant-1 to be given to Co-Conspirator-2 so she could smuggle it into the prison for Co-Conspirator-1.

22.   On or around September 12, 2024, and September 17, 2024, Informant-1 and Co-Conspirator-1 spoke telephonically. On September 12, 2024, Co-Conspirator-1 used BAYLOR'S OFFICE PHONE. The call was consensually monitored and recorded by Informant-1. On these calls, Co-Conspirator-1 and Informant-1 discussed a meeting between Informant-1 and an unnamed individual on September 23, 2024, to provide that individual with illicit narcotics to be smuggled into CTF on behalf of Co-Conspirator-1. Co-Conspirator-1 stated that the unnamed individual facilitating the smuggling on Co-Conspirator-1's behalf, "wanted a certain amount to do what they do." Co-Conspirator-1 explained the cost for the aforementioned unnamed individual would be "a stack" and that "every time they moved they want[ed] a thousand." Based on experience, investigators understood that every time contraband was smuggled by the unnamed individual, he charged $1,000, which is what Informant-1 would need to pay to smuggle in narcotics on September 23, 2024.

23.   On or around September 18, 2024, Informant-1 and Co-Conspirator 1 spoke telephonically. Co-Conspirator 1 used BAYLOR'S OFFICE PHONE. The call was consensually monitored and recorded by Informant-1. On this call, the planned meeting between the unnamed individual and Informant-1 was again discussed. The contraband desired by Co-Conspirator 1, a quantity of "strips", was discussed to be delivered to the unnamed individual facilitating the smuggling on behalf of Co-Conspirator-1, who would bring it straight into Co-Conspirator-1. Informant-1 was further instructed that a payment should be made to the unnamed individual by Informant-1. Co-Conspirator 1 reassured Informant-1 that the unnamed individual, who had yet to reach out to Informant-1, would contact Informant-1 because the unnamed individual wanted that

"money."

24.     On or around September 19, 2024, Informant-1 received a call from BAYLOR'S CELL PHONE. The call was consensually monitored and recorded by Informant-1. On the call, an individual believed to be BAYLOR identified himself as the person who will receive the package on Monday, September 23, 2024, being discussed by Co-Conspirator 1 and Informant-1, but did not provide his name. The individual believed to be BAYLOR instructed Informant-1 to meet him around 10:00 AM on Monday, September 23, 2024. Informant-1 was instructed to "text" the individual believed to be BAYLOR a description of Informant-1's car when he arrived and that Informant-1 should park in front of the building. Informant-1 asked the individual believed to be BAYLOR how he should package the items, and the individual believed to be BAYLOR instructed Informant-1 "no metals" because he had to bring it "inside." Money payable to BAYLOR was not discussed on the call.

25.     On or around September 19, 2024, and after the call described in the preceding paragraph, Informant-1 and Co-Conspirator-1 spoke telephonically. Co-Conspirator-1 used BAYLOR'S OFFICE PHONE. The call was consensually monitored and recorded by Informant-1. Co-Conspirator-1 confirmed that the unnamed individual facilitating the smuggling for Co-Conspirator-1 had contacted and made arrangements with Informant-1 to drop off his contraband on Monday, September 23, 2024. Co-Conspirator-1 told Informant-1 that the unnamed individual had forgotten to discuss money and wished to confirm Informant-1 would bring the discussed payment on Monday. Informant-1 confirmed the money would be brought to BAYLOR.

## IV.  CONCLUSION

26.  Based upon the facts and circumstances contained in this affidavit, your affiant believes there is probable cause to issue an arrest warrant for HERBERT BAYLOR for violating 18 U.S.C. § 371 (Conspiracy), 18 U.S.C. § 201(b)(2) (Bribery), and 18 U.S.C. 1791(a)(1) (Providing Contraband in Prison).

Respectfully submitted,

_____
Garrett S. Churchill
Special Agent
Federal Bureau of Investigation

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on September 20, 2024.

_____
G. MICHAEL HARVEY
UNITED STATES MAGISTRATE JUDGE